NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-1162

ADOPTION OF GIA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a decree issued by the Juvenile Court judge terminating her parental rights, approving the adoption plan of the Department of Children and Families (DCF), and granting her four posttermination and postadoption visits per year.[2] We conclude that the judge properly found clear and convincing evidence of indefinite parental unfitness caused primarily by the mother's unaddressed alcohol misuse and failure to provide a safe and stable home environment, placing the child at unacceptable physical and psychological risk. Discerning no significant error in the factual findings or the judge's

---

[1] The child's name is a pseudonym.

[2] The father of the child was never identified and is not part of this appeal.

1

determination that the child's best interests would be served by termination, we affirm.

1. Background. a. The mother's failure to address her problems with alcohol use. The mother has a concerning history of alcohol misuse, which has consistently undermined her child's well-being. On two occasions, the mother's public intoxication led to her arrest. In October 2021, a police officer encountered the mother and her friend while they were intoxicated and loudly yelling. The mother's eyes were red, her speech was slurred, and she was dressed only in a bra and skirt. She was arrested after refusing to leave the area. The mother kicked and screamed at the officer, striking him several times. She also attempted to use her body to prevent her friend's arrest. The mother admitted to officers that she had drunk "more than she should." During the trial in this case, she testified that she could not recall the incident.

In November 2022, the mother was highly intoxicated and seizing at a bar. Fire and medical personnel were called to the scene. While emergency response technicians (EMTs) strapped her onto a stretcher, the mother bit an EMT and attempted to bite a firefighter. Despite being handcuffed, she was physically and verbally combative. She was subsequently charged with assault and battery on medical staff.

2

These arrests affected the child's living situation. In January 2023, the child's maternal grandmother and a family friend both petitioned for guardianship out of concern that the mother could soon be incarcerated. The mother agreed to guardianship by the family friend to avoid the child's entering DCF's care. The mother ultimately received probation, and custody was returned to the mother.

In October 2023, DCF conducted an emergency removal of the child after the mother tested positive for alcohol use. The mother had missed an alcohol test and then tested positive two days later. The mother testified that the result was a false positive from either her use of mouthwash or contamination from spilled perfume, which the judge discredited.

In July 2024, the mother relapsed after learning that a close friend was shot. The mother did not immediately inform DCF of her relapse, nor was she receptive to services for alcohol use thereafter. That August, a social worker explained to the mother that services could help her develop coping skills to prevent relapses. The social worker testified that, when she revisited treatment for alcohol misuse that November, the mother replied that services were "BS." During trial, the mother vacillated in acknowledging her alcohol misuse. She testified in November and December 2024 that she struggled with alcohol

3

misuse, but in December 2024 also testified that she did not have problems with alcohol.

b. Unsafe and unstable home environment. The child has been exposed to domestic violence and unsafe home conditions on multiple occasions. The child witnessed the mother act as both the perpetrator and victim of domestic violence. For example, in August 2021, the mother was collecting the child from her ex-girlfriend's home when an argument broke out. The ex-girlfriend slapped a phone out of the mother's hand while the mother held the child. The mother then set the child on the ground before punching the ex-girlfriend in the face. Both individuals were criminally charged. The mother testified that she understood that she was in a domestic violence relationship with her ex-girlfriend.

Following the altercation between the mother and her ex-girlfriend in 2021, the mother repeatedly engaged the child's maternal grandmother for childcare while she struggled with alcohol use, homelessness, and unemployment. The mother would also leave the child with others, including the family friend.

In May 2022, the maternal grandmother's boyfriend's dog bit the child for a second time, leading to serious injuries requiring thirty-five stitches. During the incident, the dog dragged the child under the kitchen sink. The dog had

4

separately bitten the child's sister.  The dog was subsequently euthanized.

The mother's 2022-2023 relationship with her boyfriend also exposed the child to violence.  In September 2023, the mother had allegedly been recently evicted from her apartment and was staying with her boyfriend.  The boyfriend lived with his father, with whom he fought regularly.  The child reported that she and her mother hid in a locked room during altercations.  The mother avoided DCF for several weeks during the subsequent investigation.

Additionally, there have been several serious but unexplained incidents of physical violence involving the mother. For example, in July 2023, she engaged in an altercation with a woman at a McDonald's while still on probation for assault and battery.  As a result, she was again charged with assault and battery.  In October 2023, the family friend reported that the mother had asked her to watch the child because the mother needed to go to the hospital for broken ribs.  In March 2024, the mother canceled a visit, explaining that she had been assaulted and had a concussion; the maternal grandmother reported that the police showed up at her home three times looking for the mother's boyfriend during this time.  During a home visit in March 2024, the mother had an unexplained black eye.  In October 2024, the mother was the victim of a stabbing

5

in the stomach, which required ten stitches.  The mother "did not mention" the stabbing until a DCF worker asked her about it that December.  When questioned during trial about the stabbing, she testified, "I don't recall anything from that night, no."

The child has appeared aware of her mother's injuries.  For example, she "worried about Mother at times [and] will be attentive to Mother and any mark, bruise, cut or bandage," and would "ask Mother what happened and if she is okay."  By contrast, the child has reported feeling "safest" in the family friend's care.

The mother has historically struggled with homelessness and generally does not reside in one location for more than a few months.  After the maternal grandmother's boyfriend's dog bit the child, the mother and the child moved into a hotel.  Although the mother had an apartment at the start of the case, she lost it shortly thereafter.

Finally, the mother's home has not consistently been appropriately maintained.  During a September 2023 home visit, social workers observed her apartment in disarray.  The kitchen had plates and pans with old food on them, and the refrigerator was empty.  Later that month, social workers conducted an unannounced home visit to confirm that she had cleaned the apartment and purchased food.  When the mother did not answer, social workers called her.  She said she was running errands and

could not provide a time for when she would return.  The mother refused to schedule another home visit.  Social workers finally were able to visit nine days later.  The home was still disarrayed, though there was now food in the refrigerator.  The home had an abundance of flies.  The social workers observed a screenless open third-floor window; when they suggested closing the bottom part of the window to prevent the child from falling out, the mother refused, swore, and asked them to leave.

c.  The mother's failure to complete services.  As already discussed, the mother consistently refused to participate in alcohol misuse services.  She also failed to engage adequately in other recommended treatment, as evidenced by her "on and off" engagement with mental health services.[3]

Doctors have diagnosed the mother with bipolar disorder, depression, posttraumatic stress disorder, and an unspecified mood disorder.  Although she was initially open to treatment, she inconsistently followed through with referrals.  Mental health professionals found her difficult to reach because she frequently changed her phone number.  She occasionally maintained incorrect quantities of her prescription medications.

_____

[3] Although the mother was somewhat resistant to therapy to address her mental health diagnoses, we acknowledge that she successfully completed several domestic violence, parenting, and anger management classes as of August 2024.  Nonetheless, as the judge noted, "much of her involvement in these services occurred after they had been tasks on her Action Plan for months."

7

From September 2023 to January 2024, she did not engage in recommended mental health outpatient therapy. In August 2024, she was discharged from a mental health program because of her lack of attendance. In December 2024, the mother said she would not attend an intensive outpatient program if she would not receive credit because there was "no point."

d. Visitation. The mother was granted biweekly supervised visits following the child's removal. To her credit, she provided food and planned age-appropriate activities for the child. Social workers observed that the mother and the child were closely bonded, and that the mother was supportive and encouraging.

Unfortunately, the mother's attendance was inconsistent. She was late for a visit in February 2024 and then canceled a visit in March 2024. In April 2024, she was again late for a visit. She canceled a visit in September 2024 on the scheduled date. DCF canceled the rescheduled meeting after she failed to provide COVID-19 test results. She failed to confirm visits in October and December, again leading to their cancellation by DCF.

2. Termination of parental rights. a. Standard of review. "In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if the parent is unfit,

8

whether the child's best interests will be served by terminating the legal relation between parent and child." Adoption of Ilona, 459 Mass. 53, 59 (2011). "Parental unfitness, as developed in the case law, means more than ineptitude, handicap, character flaw, conviction of a crime, unusual life style, or inability to do as good a job as the child's foster parent." Adoption of Chad, 94 Mass. App. Ct. 828, 838 (2019), quoting Adoption of Katharine, 42 Mass. App. Ct. 25, 28 (1997). "The judge's fitness determination must be supported by 'specific and detailed' findings that demonstrate parental unfitness by clear and convincing evidence." Care & Protection of Gaston, 106 Mass. App. Ct. 450, 456 (2026), quoting Custody of Eleanor, 414 Mass. 795, 799 (1993).

To terminate parental rights, "[t]he judge 'must also find that the current parental unfitness is not a temporary condition.'" Adoption of Querida, 94 Mass. App. Ct. 771, 777 (2019), quoting Adoption of Virgil, 93 Mass. App. Ct. 298, 301 (2018). "Where there is evidence that a parent's unfitness is not temporary, the judge may properly determine that the child's welfare would be best served by ending all legal relations between parent and child." Adoption of Cadence, 81 Mass. App. Ct. 162, 169 (2012) ("Moreover, the judge is not required to grant the [parent] an indefinite opportunity for reform").

"Despite the moral overtones of the statutory term 'unfit,' the judge's decision was not a moral judgment or a determination that the mother . . . do[es] not love the child.  The inquiry instead is whether the [mother's] deficiencies or limitations 'place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child.'"  Adoption of Bianca, 91 Mass. App. Ct. 428, 432 n.8 (2017), quoting Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998).

    b.  Alcohol misuse.  Despite the mother's clearly loving her child, she has been unable to overcome significant personal challenges that prevent her from providing the child with a safe and stable home environment.  Her primary limitation as a parent is her persistent alcohol misuse.  Although substance misuse alone is not dispositive of parental unfitness, "the parent's willingness to engage in treatment is an important consideration in an unfitness determination where the substance dependence inhibits the parent's ability to provide minimally acceptable care of the child."  Adoption of Luc, 484 Mass. 139, 147 (2020).

    Although the record demonstrates that the mother appeared to be sober during visits with the child and during home visits with the social worker, she relapsed on alcohol just four months before the trial and has displayed a pattern of refusing to accept services for, or even acknowledge, her alcohol misuse.  This is despite being arrested while being publicly intoxicated

10

and a positive alcohol screen leading to the child's removal. "Evidence of parents' refusal to cooperate with the department, including failure to maintain service plans and refusal of counseling programs, is relevant to the determination of unfitness." Adoption of Rhona, 63 Mass. App. Ct. 117, 126 (2005).

To be sure, struggling with alcohol misuse alone is not a sufficient reason to remove a child, and many persons recovering from such problems are exemplary parents. Here, however, given its demonstrated impact on her child's safety and stability, the mother's unwillingness to address this issue by engaging in services speaks directly to her parental fitness. See Adoption of Talik, 92 Mass. App. Ct. 367, 373 (2017) ("Given her failure to continue treatment and her noncompliance with the other service plan tasks, it was not error for the judge to consider her substance abuse in assessing her fitness").

c. Unsafe and unstable home environment. Instances of "familial violence are compelling evidence for a finding of parental unfitness." Adoption of Talik, 92 Mass. App. Ct. at 374. "Domestic violence may imperil a child's physical safety and psychological development." Adoption of Jacob, 99 Mass. App. Ct. 258, 262 (2021). Domestic violence "that has infected the mother's life [is] . . . a proper factor for the judge to

11

consider in determining unfitness."  Adoption of Xarissa, 99
Mass. App. Ct. 610, 618 (2021).

Here, the child has been repeatedly exposed to domestic
violence, placing her psychological development at significant
risk of harm.  See Adoption of Jacob, 99 Mass. App. Ct. at 262.
For example, the child witnessed an altercation between her
mother and a former romantic partner in which the mother punched
the latter in the face.  Then, despite routine violence
occurring in her boyfriend's home, the mother chose to move her
child into his apartment.  "A judge may properly consider a
parent's decision to remain in a relationship with an abusive
partner in determining parental unfitness."  Id. at 265.  See
also Adoption of Anton, 72 Mass. App. Ct. 667, 675 (2008)
("Empty gestures at separation will not suffice").

The record shows additional indicators of an unsafe and
unstable home environment.  The mother has experienced
homelessness in the child's lifetime.  She engaged in criminal
behavior that could have led to her incarceration.  Despite
social workers' observing an unscreened open window during a
home visit, she refused to close the bottom part of it.  Despite
previous bites inflicted on the child by the maternal
grandmother's boyfriend's dog, the mother put the child in a
position to be bitten again, leading to both serious injury and
a move out of stable housing into a hotel.  Finally, the

12

mother's multiple unexplained injuries, including a black eye, broken ribs, and a stabbing wound, suggest that she has put her own safety at risk, raising the danger that she would become unavailable to care for the child. See Care & Protection of Erin, 443 Mass. 567, 572 (2005).

The mother has also shown a pattern of neglecting DCF guidance designed to help her provide her child with requisite stability. She has notably failed to reliably attend scheduled parental visits. The record shows that the mother has subjected the child to five canceled visits and two late arrivals. Most notably, the pattern of missed visits continued during the trial, demonstrating that the mother's commitment to becoming a fit parent did not improve over the course of the case. See Adoption of Cadence, 81 Mass. App. Ct. at 169 ("Moreover, the judge is not required to grant [the parent] an indefinite opportunity for reform").

"Weighing strengths against weaknesses is within the core competency of the trial judge, who has the benefit not only of the evidence, but of seeing and assessing the parents themselves." Adoption of Jacques, 82 Mass. App. Ct. 601, 608 (2012). If environmental factors indicate that a child is likely to be placed in harm's way, the judge is not required to wait for a tragedy to occur before "finding a parent unfit and freeing a child for adoption." Adoption of Breck, 105 Mass.

13

App. Ct. 652, 657 (2025). Clear and convincing evidence of the mother's persistent alcohol misuse, her failure to engage in or benefit from services, the child's home circumstances, and numerous other indicators of proximity to danger posing risks to the child combine to support the judge's assessment of parental unfitness.

d. Best interests. Appellate courts "give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. at 59. An abuse of discretion is found where "the judge has reached a result outside the bounds of reasonable alternatives." Adoption of Mariano, 77 Mass. App. Ct. 656, 660 (2010).

We discern no abuse of discretion in the judge's conclusion that the best interests of the child would be served by termination of parental rights in view of the clear and convincing evidence of the mother's indefinite unfitness and the child's desire for stability. Here the child reported that she wanted to stay with her foster family (the family friends previously selected by the mother) "for ever and ever." See Adoption of Varnell, 106 Mass. App. Ct. 716, 723 (2026) (child's wishes "should be considered in assessing his best interests").

14

In light of this evidence, the judge was well justified in concluding that the permanency resulting from a termination of parental rights followed by an adoption would be in the child's best interests.

3. Factual findings. "A finding is clearly erroneous when there is no evidence to support it, or when 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Adoption of Larry, 434 Mass. 456, 462 (2001), quoting Custody of Eleanor, 414 Mass. at 799. Here, the judge found that the mother "has a lengthy history of substance abuse of both alcohol and prescription medications." Contrary to the mother's argument, the evidence at trial supports this finding. Various medical providers expressed concern about the mother's use of prescription medicines. A social worker testified that the mother "had multiple bottles . . . of the same medication" and that the social worker was unable to count her medication in November 2024 "because [she] saw that there was too many." Moreover, the social worker testified that the mother herself "admitted having an issue with substances . . . towards the end of . . . summer [2024]." The judge "could permissibly infer" misuse from this evidence. Adoption of Daniel, 58 Mass. App. Ct. 195, 203 (2003).

The judge found that the mother had lived in her apartment "since approximately August 2024." The record establishes that the mother had the apartment by February 29, 2024, although "[t]he space was not yet furnished and there was an air mattress on the floor." Even assuming, without deciding, that the judge was required by this evidence to find that the mother lived in the apartment since February 2024, the judge's overall finding of housing instability is well founded. For example, the record shows that the mother and the child moved into a hotel following the dog-biting incident in May 2022. In September 2023, the mother moved the child into her boyfriend's home after being evicted. She repeatedly put herself at risk of incarceration.

Most important, neither of the challenged factual findings played an important part in the judge's decision. The judge's rationale for termination was based on domestic violence, the mother's misuse of alcohol, her criminality, her failure to be forthcoming, and her failure to engage in services. At no point in his summary did the judge rely on the mother's misuse of prescription medications or the lack of housing between February

16

and August 2024.  Accordingly, any error was not prejudicial.

See <u>Adoption of Ulrich</u>, 94 Mass. App. Ct. 668, 680 (2019).

<u>Decree affirmed</u>.

By the Court (Shin, Ditkoff & Tan, JJ.[4]),

Clerk

Entered:  June 30, 2026.

---

[4] The panelists are listed in order of seniority.